CECILIA E. POPP, for Herself and for All Others Similarly Situated, Plaintiff-Appellant, v. CASH STATION, INC., *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—90—0321

Opinion filed December 4, 1992.

Krislov & Associates, Ltd. (Clinton Krislov, of counsel), and William A. Barnett, both of Chicago, for appellant.

Hopkins & Sutter, of Chicago (Mark Crane, William McKenna, Jr., David Goroff, and Claudette Miller, of counsel), for appellees.

JUSTICE GORDON delivered the opinion of the court:

In this consumer class action, plaintiff seeks to enjoin the operation of defendants' automated teller machine (ATM) network due to defendants' failure to provide even minimum reasonable personal security systems for the protection of its cardholders from third-party criminal attacks, or alternatively, to require defendants to provide such security systems. Plaintiff appeals from the dismissal, pursuant to section 2—615 (Ill. Rev. Stat. 1989, ch. 110, par. 2—615), of her first amended complaint for failure to state a cause of action. We affirm the trial court's decision.

Defendant Cash Station, Inc., is an Illinois not-for-profit corporation, which, in conjunction with defendant banks, operates a network of ATMs throughout Cook County and nationwide. Plaintiff is the holder of a Cash Station card issued by the bank with which she has an account.

The Cash Station network offers customers, such as plaintiff, access to cash and other services from their existing bank accounts through ATMs at thousands of locations. Many of the ATMs are located in unsupervised locations, outside the perimeter of open businesses, and are operational outside of normal business hours. Through its advertising, Cash Station encourages customers to engage in transactions at the ATMs 24 hours a day, seven days a week.

Defendants do not provide personal security systems such as silent call systems triggered by special buttons or a combination of buttons to alert police, or cameras to record persons near the machines at the remote location, nor is access to the machines always limited to persons possessing valid ATM cards. There have been numerous well-documented cases of third-party criminal attacks on ATM customers, both in the Chicago area and nationwide.

Several years ago, Cash Station merged with another provider of ATM services in the Chicago area, Money Network. As a result of this merger, Cash Station now holds a virtual monopoly on cash access systems within the Chicagoland area, and consumers such as the plaintiff have no adequate alternative means of gaining remote access to their bank accounts.

As a result of defendants' failure to provide minimum personal security systems or to disclose that such security systems are not available, plaintiff and the class she purports to represent have suffered

substantial damages. These include being "subjected to unreasonable, repeated, and continuing risk of injury from third party attack, both when they use their ATM cards and when they merely have them in their possession, whether on their person or otherwise." Plaintiff's complaint also contends that plaintiff is damaged in being prevented from obtaining remote cash access services from other providers who could provide reasonable levels of security. Plaintiff is also damaged in that she "[is] confused and subjected to unreasonable psychological stress in possessing and using their ATM cards."

In count I of her complaint, plaintiff alleges that the defendants have violated the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1989, ch. 121½, par. 262) by marketing and selling cash card services without providing minimal personal security protection, by failing to disclose that such services were not provided, and by failing to disclose the inherent risks in the use or possession of an ATM card.

Count II, brought under the Illinois Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1989, ch. 121½, par. 311 *et seq.*), alleges that defendants' marketing of Cash Station cards without the disclosure that minimum personal security is not provided "creates a likelihood of confusion and misunderstanding for Plaintiff in possession and/or using their Cash Station cards, which threatens their [*sic*] personal security."

Count III alleges that plaintiff is a business invitee of the defendants, and that, as a result, defendants owe plaintiff a duty to maintain their premises in a reasonably safe condition to protect patrons from third-party criminal attack. Plaintiff alleges that defendants have breached this duty by failing to provide minimum reasonable personal security for users of Cash Station machines.

In count IV, plaintiff alleges that she has an agreement with the defendants under which defendants have impliedly warranted that they provide minimum personal security protection from foreseeable third-party attacks. This implied warranty has allegedly been breached by defendants' failure to provide such security.

Finally, count V alleges that the merger between Cash Station and its only significant Chicago competitor, Money Network, eliminated the competition for consumer safety systems in the Chicago area, and produced a monopoly in remote access to accounts at the participating banks. Plaintiff alleges that this action constitutes an unreasonable restraint of trade under Federal and Illinois antitrust laws. Ill. Rev. Stat. 1989, ch. 38, par. 60 *et seq.*

As relief for all the above counts, plaintiff seeks preliminary and permanent injunctions. Plaintiff seeks to enjoin the defendants from operating ATM terminals which do not provide a means of signalling for help, in locations outside the perimeter of an open business during hours outside usual business hours; and also seeks a mandatory injunction requiring defendants to implement minimum reasonable personal security protection systems, including silent alarms and/or cameras and to notify consumers of the implementation of or lack of such personal security provisions.

Cash Station moved to dismiss plaintiff's first amended complaint under section 2—615 for failure to state a cause of action. After full briefing and argument, the trial court granted the defendants' motion and dismissed with prejudice, finding that plaintiff had failed to allege facts which gave rise to a duty on the part of defendants either to protect plaintiff from third-party criminal attack or to disclose that no security systems were provided. The court also found that, in regard to counts IV and V, which pled breach of an implied warranty and violation of the antitrust laws, plaintiff had failed to plead sufficient facts to state causes of action. Plaintiff filed a timely notice of appeal.

OPINION

On appeal, plaintiff first contends that the trial court erred in finding that the facts alleged fail to show that Cash Station owed a duty of reasonable protection to its cardholders. Plaintiff urges that a business owner who has notice of prior criminal attacks occurring on his property has a duty to protect its customers, business invitees, from such attacks. Plaintiff argues that Cash Station is aware of previous criminal attacks involving ATMs, that future third-party criminal attacks are foreseeable and therefore Cash Station has a duty to take reasonable protective measures.

■ As a general rule, "there is no duty [on] a landowner to protect others from criminal attacks by third persons on his property." (*Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215, 531 N.E.2d 1358; see also *Figueroa v. Evangelical Covenant Church* (7th Cir. 1989), 879 F.2d 1427; *N.W. v. Amalgamated Trust & Savings Bank* (1990), 196 Ill. App. 3d 1066, 1071, 554 N.E.2d 629; *Petrauskas v. Wexenthaller Realty Management, Inc.* (1989), 186 Ill. App. 3d 820, 542 N.E.2d 902.) However, when there exists a special relationship between the parties, such as business invitor and invitee, the law may impose a duty to protect from reasonably foreseeable criminal activity. *Rowe,* 125 Ill. 2d at 216; *N.W.,* 196 Ill. App. 3d at 1071; *Figueroa,* 879 F.2d at 1430.

In determining whether a duty exists, reasonable foreseeability of harm is the primary concern. (*Petrauskas*, 186 Ill. App. 3d at 825; *N.W.*, 196 Ill. App. 3d at 1071.) Generalized allegations of crime will not suffice to establish that future criminal attacks are foreseeable. Compare *Petrauskas*, 186 Ill. App. 3d 820, 542 N.E.2d 902 (allegations that building was in "high crime area" and that person had been shot "across the street" from building found insufficient to make criminal attack foreseeable), with *Duncavage v. Allen* (1986), 147 Ill. App. 3d 88, 497 N.E.2d 433 (allegations that same ladder used to enter and burglarize same apartment via the same unlockable window held sufficient to establish foreseeability).

■■ Here, plaintiff bases her claim of foreseeability on allegations that 1,500 to 5,000 criminal attacks on ATM customers occur annually nationwide, including at least one in Chicago, and on the "inherent nature of customer cash withdrawals." Plaintiff, however, has made no allegations regarding specific locations or specific times at which future crimes may occur. She alleges only that a future attack may occur at one of hundreds of remote ATM facilities. In our view, these allegations are at best comparable to those made in *Petrauskas* that the building was in a "high crime area," and do not even rise to the level of an allegation that someone was shot "across the street." As a result, we cannot say that plaintiff has sufficiently alleged that future attacks are foreseeable so as to give rise to a duty on the part of defendants to protect from such attacks.

■■ Nor does plaintiff's status as an invitee on defendants' property give rise to a duty under the facts of this case. The duty owed by a landowner to an invitee has been stated as follows:

" 'A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.' " *Krautstrunk v. Chicago Housing Authority* (1981), 95 Ill. App. 3d 529, 533, 420 N.E.2d 429, quoting Restatement (Second) of Torts §343 (1965).

Another court phrased the landowner's duty to an invitee as follows:

" 'The rule is that an occupant or owner of premises owes to an invitee a duty to use ordinary care to have the premises in a reasonably safe condition for use in a manner consistent with the purpose of the invitation, not to lead such person into a dangerous trap and to give such person adequate and timely notice and warning of latent or concealed perils which are known to the owner but not to the invitee. (38 Am. Jur. *Negligence* §96, at 754-55.)' " *Swett v. Village of Algonquin* (1988), 169 Ill. App. 3d 78, 87, 523 N.E.2d 594, quoting *Altepeter v. Virgil State Bank* (1952), 345 Ill. App. 585, 598, 104 N.E.2d 334.

Under either statement, the knowledge of the landowner regarding the danger on his land is relevant. It is not, however, the only factor to be considered. Also relevant is the invitee's knowledge. "The basis of the inviter's liability for injuries sustained by the invitee on the premises rests on the owner's superior knowledge of the danger." *Altepeter*, 345 Ill. App. at 598; see also *Swett*, 169 Ill. App. 3d at 88.

In *Altepeter* the court affirmed the dismissal of a complaint which alleged that the defendant had been negligent in failing to protect the plaintiff from injuries suffered during an armed robbery at the bank. The court found that plaintiff had not alleged that defendant had any superior knowledge concerning any dangers which might be encountered on the day of the robbery, noting that "[t]he perils to customers, officers and employees of a bank, attendant upon a bank robbery or while a robbery is in progress were equally with the knowledge of appellant and appellee." *Altepeter*, 345 Ill. App. at 603.

In *Swett*, plaintiffs' decedents were killed when hit by an automobile while crossing a roadway from defendant's restaurant to its parking lot, which was located across the road from the restaurant. The court affirmed the dismissal of plaintiffs' complaint, in part, because "[a]lthough the [defendant] clearly was aware that its invitees were crossing the roadway," plaintiffs "[had] not alleged that they were unaware that the area they were crossing was a roadway for vehicular traffic." *Swett*, 169 Ill. App. 3d at 88.

*Krautstrunk* is particularly relevant to the instant case since the "condition" considered there was "rampant crime" at the Cabrini-Green housing project. The court refused to impose a duty based upon such allegations. It did, however, find a duty upon the part of the Chicago Housing Authority to protect the plaintiff, an invitee, from an attack on a vacant floor, based upon plaintiff's allegations that the defendant knew of the dangers on the vacant floor and of the presence of the assailant. The court inferred that the plaintiff was not

aware of the danger on the vacant floor or of the presence of the assailant.

There are no allegations here that defendants have any unique knowledge regarding possible future attacks at particular locations or times or involving particular assailants. The knowledge here is generic in nature, based upon nationwide statistics and one incident in the Chicago area. There are likewise no allegations that defendants have any specific knowledge regarding the risk of criminal attacks by third parties at remote ATM locations. The risk of future attacks is alleged to arise from "the inherent nature of customer cash withdrawals." There is no basis to infer from the statistical allegations of the complaint that the risk involved here is anything more than speculative and remote. Nor, for that matter, does the complaint sufficiently denote that the plaintiff is unaware of the possibility of such attacks or the risks involved.

The cases cited by plaintiff are consistent with the result we reach here. In *Marshall v. David's Food Store* (1987), 161 Ill. App. 3d 499, 501, 515 N.E.2d 134, the only issue on appeal was whether the store owner had notice of prior criminal attacks on its property so as to give rise to a duty to provide protection to its customers. The court's focus on whether the owner knew of prior attacks is consistent with our conclusion that an inviter will not be liable for criminal attacks by a third party unless he is aware of a danger of which his invitee is unaware. In *Jacobsma v. Goldberg's Fashion Forum* (1973), 14 Ill. App. 3d 710, 303 N.E.2d 226, the court found that a store owner could be held liable to the plaintiff who was injured while trying to stop a shoplifter fleeing the store. The court based its finding of liability on the fact that the defendant knew that the same shoplifter had been in the store just three days prior to the plaintiff's being injured there.

In *Orrico v. Beverly Bank* (1982), 109 Ill. App. 3d 102, 440 N.E.2d 253, also cited by the plaintiff, the court found that the defendant bank owed a duty to the decedent, an incompetent, to protect him from third-party criminal attack which it failed to do when it negligently allowed him to withdraw a substantial sum of money from his account. However, the court specifically stated that it was not basing the duty on the plaintiff's status as an invitee, the basis upon which plaintiff here contends the duty to her arises. "The duty here does not rest on decedent's status as invitee but instead stems from the tripartite relationship of decedent, the conservator, and the Bank which held his funds." *Orrico*, 109 Ill. App. 3d at 106.

■ Furthermore, foreseeability is not the only concern in determining whether a duty exists, and foreseeability alone will not result in the imposition of a duty. (*Boyd v. Racine Currency Exchange, Inc.* (1973), 56 Ill. 2d 95, 99, 306 N.E.2d 39, citing *Lance v. Senior* (1967), 36 Ill. 2d 516, 518, 224 N.E.2d 231.) Also to be considered are "the magnitude of the burden to guard against it, and the consequences of placing that burden on defendant." (*Petrauskas*, 186 Ill. App. 3d at 829; see also *Boyd*, 56 Ill. 2d 95, 306 N.E.2d 39.) As the court noted in *Bence v. Crawford Savings & Loan Association* (1980), 80 Ill. App. 3d 491, 400 N.E.2d 39:

> " 'The question whether a private party must provide protection for another is not solved merely by recourse to "foreseeability." Everyone can foresee the commission of crime virtually anywhere and at any time. \* \* \*
>
> The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it. Whether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " (Emphasis in original.) *Bence*, 80 Ill. App. 3d at 495, quoting *Goldberg v. Housing Authority* (1962), 38 N.J. 578, 583, 186 A.2d 291, 293.

We note further that the pleadings are insufficient to establish a voluntary undertaking or assumption of duty on the part of defendants to provide such protection to prospective users as in *Shea v. Preservation Chicago, Inc.* (1990), 206 Ill. App. 3d 657, 565 N.E.2d 20, cited by plaintiff.

It cannot be disputed that there is a public interest in addressing the question of ATM security. This is evident from the fact that the record on appeal contains a copy of a bill introduced in Congress in 1987 which would have set minimum security standards for ATMs, and also a proposed amendment to the Chicago Municipal Code which would have imposed licensing and security requirements on ATMs within the city.

However, in our view, a lawsuit such as this is not the proper means of addressing the concerns of plaintiff. A legislative body, whether city council, State legislature, or Congress, is clearly a more appropriate forum to address these issues. Moreover, a legislative body is better able to fashion a remedy to deal with the problem and to mandate and monitor its implementation.

A situation similar to the one before us was considered in *Berdeaux v. City National Bank* (Ala. 1982), 424 So. 2d 594. There the

court refused to impose a "duty on the banking industry to protect its customers from injury at the hands of criminal intruders who, [plaintiff] says, are drawn to banks because of their remote locations (branch banks) and the availability of large sums of cash." (424 So. 2d at 595.) The court found that, while it was sympathetic with plaintiff's plight, the law of torts was not the proper means of redressing his injury.

"Whether the revolution in the banking industry justifies a different standard of care, we cannot say. To be able to answer that question would require data that a court is ill equipped to gather, but which the legislature is especially capable of assessing. The issue itself presents a policy matter peculiarly within the province of the legislative as opposed to the judicial branch of government." *Berdeaux*, 424 So. 2d at 595.

■ The question of duty runs throughout the first three counts of plaintiff's complaint. All are torts based upon the defendants' alleged failure to provide security at its ATMs and its failure to disclose that such security is not provided. As we have concluded that defendants owed no such duty to protect plaintiff, it would follow that defendants could not be held liable for their failure to inform the plaintiff that they did not offer security systems when they had no duty in the first instance to provide such systems. Accordingly, we affirm the trial court's dismissal of counts I, II, and III.

■ We also note that, under the Illinois Consumer Fraud Act (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.*), upon which count I is based, prior to amendment in 1991 the right to seek injunctive relief was reserved to the Attorney General. (*Greenberg v. United Airlines* (1990), 206 Ill. App. 3d 40, 563 N.E.2d 1031; *Martin v. Eggert* (1988), 174 Ill. App. 3d 71, 528 N.E.2d 386; see also *Zanni v. Lippold* (C.D. Ill. 1988), 119 F.R.D. 32 (applying Illinois Consumer Fraud Act).) This case was decided in 1989, before the amendment.

In addition, plaintiff's consumer fraud claim is not sufficiently specific. Plaintiff does not allege any affirmative misrepresentation by defendant concerning security provided by its facilities. Nor does plaintiff allege with requisite specificity that defendants knew or should have known of the dangers and that plaintiff did not. "Although a claim under the Consumer Fraud Act differs from a common law fraud action, a consumer fraud claim 'must be pleaded with the same specificity that has always been a prerequisite to an action for common law fraud.' " (*Shea*, 206 Ill. App. 3d at 667, quoting *Spengler v. V & R Marathon, Inc.* (1987), 162 Ill. App. 3d 715, 717-18, 516

N.E.2d 787.) Accordingly, we would affirm the dismissal of count I for these reasons as well.

■■■ Moreover, as to count II, there is an additional basis upon which it may be dismissed. In that count, plaintiff alleges that the defendants have misrepresented the benefits of their network as being safe when in fact it is not, thereby creating a "likelihood of confusion and misunderstanding." Plaintiff urges that this conduct is a violation of sections 2(5) and 2(12) of the Illinois Uniform Deceptive Trade Practices Act. (Ill. Rev. Stat. 1989, ch. 121½, pars. 312(5), (12) (hereinafter the DTPA).) We disagree.

Section 2 of the DTPA defines those acts which constitute deceptive trade practices, and provides, in relevant part:

"A person engages in a deceptive trade practice when, in the course of his business, he:

\* \* \*

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

\* \* \*

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ill. Rev. Stat. 1989, ch. 121½, pars. 312(5), (12).

The purpose of the DTPA is "the enjoining of trade practices which confuse or deceive the consumer, or which unjustly injure the honest businessman and prevent him from receiving his just rewards from effective advertising and consumer satisfaction." (Ill. Ann. Stat., ch. 121½, Prefatory Illinois Notes, at 238 (Smith-Hurd Supp. 1992).) It is primarily directed towards acts which unreasonably interfere with another's conduct of his business. (*Greenberg v. United Airlines*, 206 Ill. App. 3d at 46 (DTPA "has generally been held to apply to situations where one competitor is harmed or may be harmed by the unfair trade practices of another"); see also Ill. Ann. Stat., ch. 121½, Prefatory Note of National Conference of Commissioners on Uniform State Laws, at 238 (Smith-Hurd Supp. 1992).) This statute was "enacted to prohibit unfair competition and was not intended to be a consumer protection statute." *Chabraja v. Avis Rent A Car System, Inc.* (1989), 192 Ill. App. 3d 1074, 1079, 549 N.E.2d 872.

Notwithstanding the DTPA's primary focus on acts between competitors, a consumer action is possible under the DTPA. (See *Greenberg v. United Airlines*, 206 Ill. App. 3d 40, 563 N.E.2d 1031; *Brooks v. Midas-International Corp.* (1977), 47 Ill. App. 3d 266, 361 N.E.2d

815.) In order to maintain such an act, the consumer must "allege facts which would indicate that he is 'likely to be damaged' in the future." (*Greenberg v. United Airlines*, 206 Ill. App. 3d at 46-47, quoting *Brooks v. Midas-International Corp.*, 47 Ill. App. 3d at 275.) The problem in most consumer actions under the DTPA is the inability to allege facts indicating the likelihood of damage in the future. *Brooks v. Midas-International Corp.*, 47 Ill. App. 3d at 275 (in a consumer action under the DTPA, "[o]rdinarily the harm has already occurred").

Plaintiff has alleged that defendants' conduct has "create[d] a likelihood of confusion and misunderstanding for Plaintiff in possession and/or using their Cash Station cards, which threatens their [*sic*] personal security." Beyond this bare conclusory allegation, however, there are no other facts alleged regarding plaintiff's confusion. There are no allegations regarding what she is confused about, or in what manner defendants' acts in failing to provide security systems or in marketing cash card services without disclosure of the risks involved may have contributed to any confusion on the part of plaintiff and other cardholders.

Moreover, plaintiff is now aware that the defendants' ATM system provides what she considers to be inadequate security. There can be no confusion in the future arising from defendants' alleged nondisclosure in marketing their services, and we are unable to envision, nor for that matter has plaintiff alleged, any situation which could occur in the future which might give rise to such confusion. (See *Greenberg v. United Airlines*, 206 Ill. App. 3d 40, 563 N.E.2d 1031 (holding that allegations that defendants' advertising of their Mileage Plus program created a likelihood of confusion insufficient to state a cause of action under the DTPA, since plaintiffs knew what the rules required and had not shown how any confusion would arise in the future); see also *Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 253, 483 N.E.2d 1263 ("plaintiffs know the problems ***, and, armed with that knowledge, can avoid it. Thus the plaintiffs are not persons who are 'likely to be damaged' by defendants' conduct in the future").) As plaintiff, in an individual capacity, cannot bring a cause of action under the DTPA because of the lack of likely future damage, she cannot do so as representative of a class. (*Brooks v. Midas-International Corp.*, 47 Ill. App. 3d 266, 361 N.E.2d 815.) Accordingly, the trial court's dismissal of count II was correct for failure to state a cause of action under the DTPA as well as for lack of any duty owed to the plaintiff.

In count IV, plaintiff attempts to state a cause of action for breach of an implied warranty, alleging that "defendants impliedly

warrant to the plaintiff class that they provide the plaintiff class with minimum reasonable personal security protection from foreseeable third party attack." She urges in her brief that this warranty "arises out of the parties' relationship."

■ The allegations of this count, however, are sketchy and conclusory. (See *Shea v. Preservation Chicago, Inc.*, 206 Ill. App. 3d at 659 ("plaintiff's complaint did not allege sufficient facts to show that defendants breached an oral or written contract to protect plaintiff from third-party attacks").) Beyond the mere "relationship" of the parties, the source of the implied warranty is unclear. While the complaint makes some reference to a written agreement between plaintiff and defendants, if the alleged warranty is based on a written contract, plaintiff has failed to attach a copy of that agreement or an affidavit stating that the agreement is unavailable to her complaint, as required by section 2—606 of the Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—606.) Such failure is grounds for dismissal. See *Plocar v. Dunkin' Donuts of America, Inc.* (1981), 103 Ill. App. 3d 740, 431 N.E.2d 1175.

To the extent that the alleged warranty is based on something other than a written agreement, this count would appear to be simply an attempt to recast the tort count in terms of an implied warranty. This she cannot do unless there are allegations that defendant has profited by its actions. (*Altepeter v. Virgil State Bank*, 345 Ill. App. at 594, citing *Howard v. Swift* (1934), 356 Ill. 80, 85, 190 N.E. 102.) "In the absence of any averment that the bank either directly or indirectly derived any benefit by reason of the misconduct charged against it and where it does not appear that there has been any enrichment of the wrongdoer emanating from the wrongful act committed by him, an injured party may not waive the tort and sue on a breach of an express or implied contract." (*Altepeter v. Virgil State Bank*, 345 Ill. App. at 594.) The ability to sue on the contract is premised on the fact that when a wrongdoer has benefited from his acts, he is bound to restore to the other party any gains received. (*Howard v. Swift*, 356 Ill. at 85-86. See generally 1A C.J.S. *Actions* §109, at 520 (1985) ("whenever a party has derived a pecuniary advantage from a wrong done by him, the person wronged may waive the tort and maintain an action in contract, for money had and received, or for an accounting on an implied contract").) As there are no allegations that defendants have profited from any wrongful act towards the plaintiff, plaintiff may not waive the tort and bring this contract warranty count. Accordingly, we affirm the trial court's dismissal of count IV of plaintiff's complaint.

Finally, we also affirm the dismissal of count V, which sought to allege a violation of the Illinois antitrust laws (Ill. Rev. Stat. 1989, ch. 38, par. 60—3) in the merger of Cash Station with Money Network.

■ Monopoly, in and of itself, is not illegal. (*State ex rel. Burris v. Panhandle Eastern Pipe Line Co.* (7th Cir. 1991), 935 F.2d 1469, 1481.) What is illegal under the antitrust laws is the use of anticompetitive means to achieve or maintain a monopoly. (*Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d at 1481.) "The offense of monopoly *** has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." (*United States v. Grinnell Corp.* (1966), 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 786, 86 S. Ct. 1698, 1704.) Monopoly power has been defined as "the power to control prices or exclude competition," and may be inferred from the fact that a defendant has the predominant share of the relevant market. (*United States v. Grinnell Corp.*, 384 U.S. at 571, 16 L. Ed. 2d at 786, 86 S. Ct. at 1704.) To recover, a plaintiff must establish that the defendant has engaged in some type of prohibited anticompetitive conduct and that that conduct has resulted in injury. (*Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469; see also *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.* (6th Cir. 1984), 729 F.2d 1050, 1058.) Further, to constitute an antitrust violation, the injury must be what has been termed an "anti-trust injury." That is, an injury "of the type [which] the antitrust laws were [designed] to prevent and that flows from that which makes defendants' acts unlawful." (*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* (1977), 429 U.S. 477, 489, 50 L. Ed. 2d 701, 712, 97 S. Ct. 690, 697.) An antitrust injury is economic in nature. "[A]ntitrust injury 'means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws.' " (*Nelson v. Monroe Regional Medical Center* (7th Cir. 1991), 925 F.2d 1555, 1564, quoting *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.* (7th Cir. 1986), 784 F.2d 1325, 1334.) Even if an injury is causally related to an antitrust violation, it will not be considered an antitrust injury unless it is attributable to an anticompetitive aspect of the defendants' actions. *Nelson v. Monroe Regional Medical Center*, 925 F.2d at 1565; see also *Cargill, Inc. v. Monfort of Colorado, Inc.* (1986), 479 U.S. 104, 109-10, 93 L. Ed. 2d 427, 435, 107 S. Ct. 484, 488-89; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 50 L. Ed. 2d 701, 97 S. Ct. 690.

Here, beyond the conclusory allegation that Cash Station has a "virtual monopoly," there are no allegations that Cash Station pos-

sesses any monopoly power to control prices or to exclude competition. There is insufficient indication of what percentage of the market Cash Station controls, and therefore the complaint lacks any basis from which such power might be inferred. Also somewhat unclear is the relevant geographic market against which defendants' market share is to be measured. In one portion of her complaint, plaintiff alleges that Cash Station operates its network "throughout Cook County and nationwide," while later in the complaint there are allegations that the monopoly exists "within the Chicagoland marketing area."

The complaint also lacks sufficient allegations that whatever market share defendants do possess was achieved or is maintained by any means prohibited by the antitrust laws. Plaintiff has alleged only that Cash Station merged with Money Network and that this merger "constituted an unreasonable restraint of trade" and resulted in the alleged monopoly. Beyond this, however, the complaint is devoid of any factual allegations regarding defendants' conduct which would arguably bring it within the scope of conduct prohibited by the antitrust law. Moreover, plaintiff's fear of criminal attack is clearly not the type of injury contemplated by the antitrust laws. It cannot be fairly characterized as an economic injury. Plaintiff has made no allegations that higher prices for ATM services have resulted from the merger, nor has she specifically pleaded that there has been a reduction in the output of security systems. She offers only speculation that, but for the merger, there would be competition between providers of ATM services and that if such competition existed, one or more competitors would provide the systems which plaintiff seeks.

Furthermore, we also note that plaintiff has failed to sufficiently demonstrate her entitlement to the relief which she seeks throughout her complaint, *i.e.*, a mandatory injunction. Mandatory injunctions are disfavored by the courts, and are granted only in cases of "great necessity or extreme urgency." (*Grillo v. Sidney Wanzer & Sons, Inc.* (1975), 26 Ill. App. 3d 1007, 1012, 326 N.E.2d 180.) The party seeking the mandatory injunction must positively and certainly establish that the urgency of the situation necessitates such action. (*Sadat v. American Motors Corp.* (1984), 104 Ill. 2d 105, 470 N.E.2d 997; *Northrop Corp. v. AIL Systems* (1991), 218 Ill. App. 3d 951, 578 N.E.2d 1208.) Here, plaintiff has not established any such urgency. The injuries alleged are all speculative and remote. There are insufficient allegations in the pleadings as to the individual plaintiff and as to location of any imminency of harm from criminal attack caused by the lack of security systems. As a result, we find that there has been

an insufficient showing of the necessity which would arguably entitle plaintiff to a mandatory injunction.

As did the trial court, we have determined that each count of plaintiff's complaint should be dismissed. We need not, therefore, discuss at any length defendants' contention that the plaintiff lacks standing to bring this action. It should be noted, however, that we would be hesitant to find standing lacking based solely on the fact that plaintiff has suffered no actual physical attack and cannot identify precisely when or where such an attack may occur. See *DiMarzo v. Cahill* (1st Cir. 1978), 575 F.2d 15, 18 (inmates at correctional facility had standing to bring action alleging fire hazards at facility; "[o]ne need not wait for the conflagration before concluding that a real and present threat exists"); *Cutler v. Kennedy* (D.D.C. 1979), 475 F. Supp. 838 (plaintiffs' contention that they were being subjected to risk to their health on account of marketing of over-the-counter drugs without adequate testing sufficient to confer standing on plaintiffs).

Accordingly, for all the above reasons, the judgment of the circuit court of Cook County dismissing plaintiff's complaint is affirmed.

Affirmed.

McNULTY, P.J., and LORENZ, J., concur.